**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

UNITED STATES OF AMERICA                                             PLAINTIFF

v.                                   NO. 4:07CR00103 JLH

BARRY J. JEWELL                                                      DEFENDANT

## SENTENCING OPINION

Barry J. Jewell has come before the Court for sentencing, and the parties have raised

numerous issues for the Court to address, so the Court is issuing this written opinion to state the

rulings on the various issues that have arisen and to explain the reasons for the sentence.

### I.

Jewell is a lawyer licensed to practice in Arkansas.  He has expertise as a tax lawyer,

particularly with regard to pension plans.  He was formerly in a partnership with Keith Moser.  He

was indicted on one count of conspiring with Moser to commit mail fraud, four counts of money

laundering, and one count of aiding and abetting in tax evasion.  At trial, the Court dismissed the

money laundering counts, and the jury acquitted Jewell on the charge of conspiring to commit mail

fraud.  However, the jury convicted Jewell on the charge of aiding and abetting in tax evasion in

violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2(b).  Jewell is now before the Court to be sentenced

for the crime of which he was convicted.  Before turning to the sentencing issues, the Court will state

briefly the facts that resulted in Jewell being convicted of aiding and abetting tax evasion.

In the summer of 2000 a client of Jewell's, Carl Evans, settled a copyright infringement case

in which he was the plaintiff for a total of $3,000,000.  The proceeds of the settlement went

$2,062,500 to Evans, and $937,500 to a company he owned, Press Promotions, Inc.  Jewell and

Evans met with Evans's litigation attorney, Kirby Lockhart, and Jewell told Evans at that meeting that he had a plan to respond to Evans's concern about the taxes involved in the $3,000,000 settlement. Jewell and Evans then met in Jewell's office, and Jewell presented Evans with a plan to reduce the taxes. The documents that Jewell presented to Evans showed that he would owe $961,125 in income taxes without tax planning, and that Press Promotions would owe $195,000, which would result in a total income tax due on the $3,000,000 settlement of $1,156,125 without tax planning. Jewell said that he had a plan that would reduce the taxes owed by Press Promotions, Inc., to zero, and the taxes owed by Evans to $130,480. The plan included placing $2,300,000 in a profit sharing trust. According to the documents that Jewell presented to Evans at that meeting, the total tax bill would be reduced by $1,025,645. Jewell proposed that his firm be paid 10% of that amount, which would result in $102,565 in legal fees and expenses. Evans agreed to the plan but negotiated the fee to $62,500.

Jewell then created a pension plan and other documentation and transferred $1,812,500 of the settlement proceeds to a brokerage account in the name of MIN Enterprises, Inc. Profit Sharing Trust. He named an unrelated third party, Robert J. Standard, as the administrator for the profit sharing trust, even though Standard never acted as the administrator and never even knew of the existence of the trust. Thereafter, Robert J. Standard's signature was forged on documents pertaining to the profit sharing trust. Jewell created documents showing that the profit sharing trust had been created in February 1998, when in fact it was created in July 2000. The proof at trial showed that documents dated in February 1998 bore an employer identification number issued by the Internal Revenue Service in July 2000, so there is no doubt that these documents were backdated. Jewell's signature is on at least one of these documents, along with the forged signature of Robert J. Standard.

On October 24, 2000, Jewell wrote a letter addressed to Evans which Evans was to give to the accountant who prepared his tax returns.  The letter stated:

> On September 7, 1999, you signed an Agreement for Copyright Assignment with a venture capital group whereby the firm would advance you the money necessary to proceed with your litigation over copyright infringement with Comcast and would pay you the sum of $250,000.00 upon certain conditions when the litigation was complete, regardless of the outcome.  Consequently, upon settlement of the litigation this summer, you received $250,000.00 as your share of the proceeds, Press Promotions, Inc., received $937,500.00, and the remainder went to the venture capital group.  The $250,000.00 you received should be treated as ordinary income on your personal income tax return for 2000.

That letter was then presented to the accountant who prepared Evans's tax returns for the year 2000. In reliance upon that letter, Evans's accountant prepared his income tax returns showing that he received $250,000 of the proceeds of the settlement of the copyright litigation and reported that $250,000 as ordinary income.

Evans had not signed or otherwise entered into any agreement of the sort described in Jewell's October 25 letter.  No one had advanced him the money necessary to proceed with his litigation over copyright infringement.  No one had paid him $250,000 upon certain conditions when the litigation was complete, regardless of the outcome.  Evans had received $2,062,500 that should have been reported as ordinary income, rather than $250,000 stated in Jewell's letter.

In 2002 the funds in the MIN Enterprises, Inc. Profit Sharing Trust were rolled over into the CRE Enterprises, Inc. Profit Sharing Trust, which Evans described at trial as his personal retirement account.  Over the years, when Evans withdrew funds from these accounts, he paid taxes on what he withdrew.  In 2007 the IRS disallowed the tax exempt status of the CRE Enterprises, Inc. Profit Sharing Trust retroactive to 2002 and reached a settlement with Evans pursuant to which Evans was not sanctioned.

3

## II.

Sentencing by a United States District Court is governed by 18 U.S.C. § 3553. Subsection (a) states the factors that the court must consider in imposing sentence. Subsection (b) provides that the court shall impose a sentence within the kind and within the range established by the guidelines issued by the United States Sentencing Commission. In *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), the Supreme Court held that any fact that is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt. *Id*. at 244, 125 S. Ct. at 756. In a remedy portion of the *Booker* decision, the Supreme Court then held that subsection (b)(1), which requires sentencing courts to impose a sentence within the guideline range, should be excised, leaving a statutory scheme in which the sentencing guidelines are advisory, *i.e.*, one factor to be considered among others, rather than mandatory. *Id*. at 259, 125 S. Ct. at 764. Following *Booker*, the Supreme Court held in *Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007), that a court of appeals may apply a presumption of reasonableness to a district court sentence that reflects a proper application of the sentencing guidelines. *Id*. at ___, 127 S. Ct. 2462. The Supreme Court explained that the Sentencing Commission examined tens of thousands of cases in preparing the guidelines, so the guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id*. at ___, 127 S. Ct. 2465. "An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general." *Id*.

4

Although the sentencing guidelines are advisory, the Court must begin all sentencing proceedings by correctly calculating the applicable guideline range. *Gall v. United States*, ___ U.S. ___, ___, 128 S. Ct. 586, 596, 169 L. Ed. 2d 445 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Id*. After giving the parties an opportunity to argue for whatever sentence they deem appropriate, the court "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id*. The district court, unlike an appellate court, "may not presume that the Guidelines range is reasonable." *Id*. at 596-97. The district court "must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id*. at 597. Then, after setting the sentence, the court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id*.

### III.

The first issue is the determination of the base offense level under the sentencing guidelines. Using the sentencing guidelines manual issued November 1, 2000, the presentence report determined that the base offense level under the sentencing guidelines was eighteen.[1] The guideline for violation of 26 U.S.C. § 7201 is found in U.S.S.G. § 2T1.1. Subsection 2T1.1(a)(1) establishes a base offense level from the table found in U.S.S.G. § 2T4.1. The presentence report reflects that the tax loss

---

[1] The presentence report used the United States Sentencing Commission Guidelines Manual effective November 1, 2000, because that is the manual that was in effect when Evans's 2000 tax return was filed and because it is more favorable to Jewell than the current manual. Neither party has objected to using the 2000 manual. Unless otherwise noted, all references in this opinion to the guidelines are references to that manual.

amount is $737,436, which is more than $550,000, so U.S.S.G. § 2T4.1(M) establishes a base offense level of eighteen.  The presentence report further reflects a two level enhancement pursuant to U.S.S.G. § 2T1.1(b)(2) because the offense involved a sophisticated concealment, as well as a two level enhancement pursuant to U.S.S.G. § 3B1.3 because the offense involved an abuse of trust. Thus, the offense level determined by the presentence report is twenty-two.

Jewell has objected to the calculation of the base offense level, as well as the adjustments. He contends that there was no loss, so the base offense level pursuant to U.S.S.G. § 2T1.4(a)(2) is six.  He denies that the letter upon which the accountant relied constituted sophisticated concealment, so he objects to the two level enhancement on that ground.

Jewell first argues that the jury made no finding of actual loss, so loss cannot be used to enhance his sentence under the Sixth Amendment to the Constitution of the United States.  He cites *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *United States v. Tucker*, 217 F.3d 960 (8th Cir. 2000), in support of that argument.  If the sentencing guidelines were mandatory, Jewell's argument might have merit.  However, the remedial portion of the opinion in *Booker* effectively rendered the guidelines advisory.  *Booker*, 543 U.S. at 244-45, 125 S. Ct. at 756-57.  Under the sentencing regime established by *Booker*, the Court may make findings of fact in connection with determining the appropriate range under the sentencing guidelines, including findings of fact upon which enhancements are based, so long as the Court does not consider the guidelines mandatory and does not impose a presumption of reasonableness in favor of a sentencing within the guideline range.  *United States v. Villareal-Amarillos*, ___ F.3d ___, Nos. 07-3616, 07-3741, 2009 WL 939125, *4 (8th Cir. Apr. 9, 2009); *United States v. Salter*, 418 F.3d 860, 862 (8th Cir. 2005).

6

Jewell next argues that there was no tax loss, even though the jury was required to find the existence of a tax deficiency in order to find him guilty of aiding and abetting in tax evasion in violation of 26 U.S.C. § 7201.  He says that U.S.S.G. § 2T1.1(a)(2) provides for a level six if there is no tax loss, and since the statute is not violated in the absence of a tax deficiency, a tax loss and a tax deficiency must be different things.  However, Jewell has cited no case finding a tax deficiency but no tax loss.

In *United States v. Scholl*, 166 F.3d 964 (9th Cir. 1999), the court affirmed a district court's determination under U.S.S.G. § 2T1.1 that no reasonable estimate could be made based on the available facts of what the tax loss had been, so the offense level was six as stated in U.S.S.G. § 2T1.1(a).  *Id.* at 981.  The defendant in that case had failed to report both gambling income and gambling losses.  He was convicted of violating 26 U.S.C. § 7206(1), which makes it a crime to make willful misstatements on tax returns but which does not require a tax deficiency or a tax loss as an element of the crime.  U.S.S.G. § 2T1.1 governs violations of 26 U.S.C. § 7206 as well as violations of 26 U.S.C. § 7201.  Because § 2T1.1 governs at least one offense in which a tax deficiency is not an element, it is not necessarily true, as Jewell argues, that § 2T1.1's provision for a base offense level of six when there is no tax loss means that there can exist a tax deficiency when there is no tax loss.

Jewell next argues that there is no tax loss because Evans has paid taxes on funds withdrawn from MIN Enterprises, Inc. Profit Sharing Trust and from the CRE Enterprises, Inc. Profit Sharing Trust, and in 2007 Evans entered into a settlement with the IRS pursuant to which he paid additional taxes but did not pay penalties and was not subject to any sanctions.  According to Jewell, there is

no tax loss because Evans either has or will pay taxes on all of the income received from the settlement of the copyright infringement case in 2000.

Jewell overlooks U.S.S.G. § 2T1.1(c)(5), which provides, "The tax loss is not reduced by any payment of the tax subsequent to the commission of the offense." The offense was complete when Evans filed his income tax return for the year 2000, reporting $250,000 of ordinary income from the copyright infringement case instead of the amount of $2,062,500 that he had actually received that year. *See Sansone v. United States*, 380 U.S. 343, 354, 85 S. Ct. 1004, 1011, 13 L. Ed. 2d 882 (1965) (holding that it is not a defense to a § 7201 evasion charge that the defendant intended to report the income and pay the tax at a later time and stating that the crime is complete as soon as the false return is filed). For purposes of calculating the appropriate offense level under U.S.S.G. § 2T1.1, payments subsequent to the filing of the 2000 return may not be considered.

At trial, the government called as a witness Brian Miller, a revenue agent with the Internal Revenue Service. Miller reviewed the Form 1040 that Evans filed for the year 2000. According to Miller, the tax actually paid by Evans that year was $121,159. Miller calculated the tax due and owing as a result of the actual income received by Evans during 2000 from the settlement of the copyright infringement case. According to Miller's calculation, Evans should have paid income taxes of $858,595 for the year 2000. The difference between what was paid and what should have been paid was $737,436, according to Miller's testimony. That testimony is the basis for the tax loss calculation in the presentence report.

Although the jury was not asked to make a finding of the amount of the tax deficiency, the jury was instructed that the government was required to establish beyond a reasonable doubt that Evans owed substantially more income tax for the tax year 2000 than was reported. Because the jury

8

returned a guilty verdict, it necessarily follows that the jury found beyond a reasonable doubt that Evans owed substantially more income tax for the tax year 2000 than was reported.

At the sentencing hearing, Jewell presented the testimony of Philip Miron, a tax attorney practicing in Little Rock.  Miron testified that Evans paid more taxes under the plan proposed and executed by Jewell and Moser than he would have paid under a plan that he could have prepared. However, Miron's testimony assumed that some or all of the settlement proceeds distributed to Evans could have been distributed to Press Promotions.  He also assumed that some significant portion of the settlement proceeds constituted payment for patentable items and therefore could have been treated as capital gains.  The Court does not believe that either assumption is accurate.  The Jewell/Moser plan allocated seventy-seven copyrights to Evans and thirty-five to Press Promotions. Approximately seventy-six of the copyright registration certificates were attached to the complaint in the copyright infringement case and were received in evidence at the sentencing hearing.  Of those seventy-six certificates, seventy-two identify Evans as the author and four identify Press Promotions as the author.  All seventy-two of the copyright certificates identifying Evans as the author were for text.  According to Miron's testimony, copyrights are not capital assets under the Internal Revenue Code unless they are patentable.  None of the seventy-two copyright certificates identifying Evans as the author would be patentable.  One of the four copyright certificates identifying Press Promotions as the author was for a compilation program and so might be patentable software, but, even if so, that would not affect Evans's personal income tax.  The Court believes neither that the allocation of seventy-seven copyrights to Evans was in error, nor that the proceeds from the sale of those copyrights should have been treated as capital gains on Evans's personal income tax return.

9

The only persuasive evidence as to the amount of additional tax due for the year 2000 is the testimony of Brian Miller.  In determining the base offense level under the guidelines, the Court accepts Miller's testimony establishing a tax loss for the year 2000 in the amount of $737,436.  Thus, the base offense level from the table in U.S.S.G. § 2T4.1(M) is eighteen, because the tax loss is more than $550,000 and less than $950,000.

Jewell also objects to the enhancement based on U.S.S.G. § 2T1.1(b)(2) for an offense that involved "sophisticated concealment."  He argues that the letter he wrote, upon which the accountant relied, did not constitute sophisticated concealment.  Application Note 4 to § 2T1.1 provides:

> For purposes of subsection (b)(2), "sophisticated concealment" means especially complex or especially intricate offense conduct in which deliberate steps are taken to make the offense, or its extent, difficulty to detect.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore bank accounts ordinarily indicates sophisticated concealment.

The "Background" commentary to § 2T1.1 states, "Although tax offenses always involve some planning, unusually sophisticated efforts to conceal the offense decrease the likelihood of detection and therefore warrant an additional sanction for deterrence purposes."

Here, the effort to conceal the tax fraud was more than Jewell's letter.  Jewell's letter caused the accountant and Evans to file a false and fraudulent tax return, but the efforts to conceal the fraud included the preparation of documents to show that the MIN Enterprises, Inc. Profit Sharing Trust was created in 1998, when in fact it was created in 2000, and the use of forged signatures of Robert J. Standard to give an appearance that the profit sharing trust had a trustee that it did not have.  These were deliberate steps taken to make the offense difficult to detect, comparable to the use of fictitious entities or corporate shells.  Therefore, the two level enhancement for sophisticated concealment is appropriate.

10

Subsection 2T1.1(b)(2) provides for an increase by two levels for sophisticated concealment. U.S.S.G. § 3B1.3 provides for a two level enhancement if the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense. Jewell was an attorney, licensed to practice law, who was representing Carl Evans in this transaction, so he had a position of trust. He had special skill in the area of tax law, and specifically with reference to pension plans, and he used that special skill to facilitate the commission and the concealment of the offense. Therefore, the offense level is increased by two levels pursuant to U.S.S.G. § 3B1.3.

The final offense level is twenty-two. Jewell has no prior convictions, so the criminal history category is I. Based on an offense level of twenty-two, and a criminal history category of I, the sentencing guidelines provide for a term of imprisonment in the range of 41 to 51 months and a fine in the range of $7,500 to $75,000. The statute of conviction provides for a term of imprisonment of not more than five years and a fine of not more than $100,000 plus costs of the prosecution.

## IV.

After determining the range of punishment under the sentencing guidelines, the next step is to determine whether to depart from that range for reasons provided for in the guidelines manual. Jewell argues that the Court should depart downward under U.S.S.G. § 5K2.20 because the conduct of conviction was aberrant behavior. U.S.S.G. § 5K2.20 provides, in pertinent part, "a sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal constituted aberrant behavior." Application Note 1 to § 5K2.20 defines "aberrant behavior" as "a single criminal occurrence or single criminal transaction that (A) was committed without

significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life."

This is not the kind of "extraordinary case" contemplated by U.S.S.G. § 5K2.20.  It would not be true to say that the offense was committed without significant planning.  As previously explained, the offense involved not only the preparation of the letter upon which the accountant relied but also the preparation of trust documents designed to conceal the fraud both by backdating the documents and by the use of forged signatures.  That conduct continued from the summer of 2000, when the fraudulent trust documents were created, until May 23, 2002, when a letter written over the forged signature of Robert J. Standard was written to Lathrop Investment Management Corporation for the purpose of directing a rollover of the account balance from the MIN Enterprises, Inc. Profit Sharing Trust to the CRE Enterprises, Inc. Profit Sharing Trust.

More significantly, it is simply not true to say that Jewell's conduct in this case represents a marked deviation from an otherwise law-abiding life.  While it is true that this is Jewell's first conviction, it is not true that what he did in this instance is a marked deviation from an otherwise law-abiding life.  Although Jewell was acquitted of conspiracy to commit mail fraud, the evidence on that count, as well as other evidence, established that he participated in sham transactions and dishonest dealing in the years preceding the Evans tax fraud.

Starting in 1998, Jewell and Moser first loaned more than $400,000 to Scanning Technologies and then invested more than a million dollars in Scanning Technologies, which was owned by Bob Bomar, who was Jewell's client.  Jewell and Moser created promissory notes to make it appear that part of the money consisted of loans from an entity named FBN Investments, which was a sham corporation controlled by Jewell and Moser and incorporated in Wyoming.  A person

named Fran Post, who lived in Wyoming, was listed as FBN's registered agent for service of process. Fran Post was paid $500 a month for picking up the mail in Wyoming, where she lived, and sending it unopened to the Jewell and Moser law firm.  She also wrote checks at Keith Moser's direction. She had no actual involvement in FBN other than picking up the mail and writing checks at Moser's direction.  In addition to creating promissory notes from Scanning Technologies payable to FBN Investments, Jewell and Moser also took stock in Scanning Technologies in the name of EAB Enterprises, which was an entity that Moser controlled.  It was disputed at trial as to whether Bomar was told that the loans from FBN and the investments from EAB actually were coming from Jewell and Moser, but for purposes of sentencing the Court will assume that Bomar knew.  The money purportedly invested by EAB came from the Jewell and Moser client trust account.

Scanning Technologies was involved in litigation in North Carolina in 1997.  In connection with that litigation, Jewell was deposed.  He testified under oath that none of the money loaned to Scanning Technologies came from him or Moser, which was not true.  As mentioned, Jewell and Moser had loaned more than $400,000 to Scanning Technologies but had promissory notes made payable to FBN, and they had invested more than $1 million from their client trust account in return for some of which they had taken stock in the name of EAB Enterprises.  According to the government's theory of the case on the conspiracy to commit mail fraud, a large portion of the money that was invested in Scanning Technologies belonged to Jewell and Moser's clients, so it was stolen from their clients.[2]  While conceding that money invested in Scanning Technologies was paid

---

[2] The mail fraud alleged in Count I of the indictment was a lulling conspiracy in which letters were written to assure clients that their money was still in the client trust account and encouraging more money to be entrusted to the client trust account.  All of such letters introduced at trial were written by Moser.

from the client trust account, the defense theory of the case, in part, was that Jewell and Moser had deposited their own funds into the client trust account, so it was their money that was used for the investments in Scanning Technologies. Whether the money invested in Scanning Technologies in the name of EAB Enterprises all belonged to Jewell and Moser, as Jewell argues, or belonged in part to Jewell and Moser and in part to their clients, as the government argues, Jewell testified falsely in his deposition in the Piedmont litigation when he denied that any of the money loaned to Scanning Technologies came from him or Moser.

In 1996, subsequent to his divorce in 1995, Jewell received no salary from the law firm, where he worked full-time, but he did receive "loans" from the law firm. In December 1996, he filed for bankruptcy in the state of Texas and listed his residence as Plano, Texas, rather than Little Rock, Arkansas. On January 14, 1997, he submitted bankruptcy schedules under penalty of perjury, stating that he worked in "sales" for FBN Investments and denying any ownership interest in Jewell and Moser. His "loans" from Jewell and Moser were listed in the schedule of creditors holding unsecured debts. Two months later he testified in the North Carolina litigation that he worked at Jewell and Moser and was a shareholder in that firm. At the sentencing hearing, he introduced evidence that his certificate of ownership in the Jewell and Moser law firm was cancelled on January 5, 1996. A new certificate was issued on February 6, 1997, three weeks after he signed the bankruptcy schedules under penalty of perjury.

There was also proof that in 1998 Jewell received a check for $5,000 from EAB Enterprises bearing the signature of Ed Brim. Ed Brim was a former client of Jewell's who died in 1995. EAB Enterprises was created for Brim, but after his death Moser controlled it. At some point Jewell supplied Moser with a driver's license that had been issued to Brim so Moser could open an account

14

with Brim as the signatory.   Thereafter, Moser wrote checks on that account and signed Brim's

name.   One of those checks was the $5,000 check written to Jewell and negotiated by him in 1998,

three years after Brim died.   Ed Brim's widow testified that Barry Jewell went to his funeral, so he

certainly knew that Ed Brim died in 1995.   Ed Brim's signature was forged on the check written to

Jewell in 1998, and Jewell had to know that the check written to him was written with a forged

signature.

In July 2001 Jewell contributed $7,850 to a bogus charity called the Christian Missionary

Fund, which was set up and controlled by Keith Moser as a means for obtaining fraudulent tax

deductions.   In August 2001, a check was written from the Christian Missionary Fund account in the

amount of $7,837.50[3] to pay the tuition for the private school where Jewell's children attended.

Moser testified that he, Jewell, and others contributed to the Christian Missionary Fund for the

purpose of taking tax deductions to which they were not entitled.

The evidence is sufficient to show that Jewell's conduct for which he was convicted was not

aberrant behavior.   Viewing the evidence from 1995 through 2002, Jewell's conduct on the count

of conviction was hardly "a marked deviation . . . from an otherwise law-abiding life."[4]   The Court

rejects Jewell's argument that he is entitled to a downward departure pursuant to U.S.S.G. § 5K2.20.

---

[3] Moser testified that the sum of $22.50 was withheld to pay expenses for maintaining the
fund.  Otherwise, all of the money paid to the Christian Missionary Fund by Jewell was spent to
benefit Jewell's family.

[4] On the other hand, Jewell appears to have led a law-abiding life from mid-2002, when
his law firm came under investigation, to the present.

# V.

After determining the range provided in the sentencing guidelines and considering whether to depart for reasons provided for in the sentencing guidelines manual, the Court must impose a sentence pursuant to 18 U.S.C. § 3553(a), which provides:

(a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

   (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

   (2) the need for the sentence imposed--

      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B) to afford adequate deterrence to criminal conduct;

      (C) to protect the public from further crimes of the defendant; and

      (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a). The individualized assessment necessary to determine the appropriate sentence for Jewell with respect to each of the elements to be considered under § 3553(a)(2) is stated below.

## A.   THE NEED FOR THE SENTENCE TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT

The offense of conviction involved a deliberate, calculating, dishonest scheme executed by Jewell over a sustained period of time resulting in the understatement of taxes owed by Carl Evans in the year 2000 by more than $700,000. As has been mentioned, Jewell wrote a letter, upon which an accountant relied in preparing Evans's tax returns. In that letter, Jewell lied about the amount of

income that Evans had received from the copyright infringement litigation.   Jewell prepared documents to show that the profit sharing trust into which funds were deposited was created in 1998, when in fact it was created in the summer of 2000.  To create the appearance that it had a trustee that it did not have, the signature of Robert J. Standard was forged on numerous documents until the funds were rolled over into a different account in May 2002.  Thus, there was a sustained, deliberate, calculating, dishonest scheme executed by Jewell in connection with the count of conviction.  The conduct was not only dishonest, it manifested gross disrespect for the law.  Moreover, Jewell was a lawyer and therefore had a position of trust, which he abused.  The items to be considered under § 3553(a)(2)(A) require that the sentence include a substantial term of imprisonment.

**B.**     **THE NEED FOR THE SENTENCE TO AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT**

It is hard to avoid the conclusion that, in this case, the need for the sentence to afford adequate deterrence to criminal conduct leads to the conclusion that a substantial term of imprisonment must be imposed.  Hardly anyone enjoys paying taxes.  Professionals who give tax advice routinely and regularly are asked by clients to find ways to avoid, reduce, minimize, or delay paying taxes.  Of course, it is legitimate on the part of taxpayers to seek lawful means to accomplish those goals, and it is legitimate for professionals giving tax advice to direct their clients to lawful means for obtaining those goals, but the temptation to use unlawful means to avoid, reduce, minimize, or delay paying taxes may be strong, especially when a large amount of money is involved.  Professionals who provide tax advice need to know that a deliberate, calculated, dishonest scheme resulting in the understatement of a large amount of taxes will result in a substantial term of imprisonment.

**C.       THE NEED TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT**

As mentioned above, from 1995 through 2002, Jewell engaged in numerous acts of dishonesty. From 2002 to the present, there is no evidence that Jewell has engaged in or participated in any criminal activity of any kind. It seems unlikely that Jewell would commit another crime and face the potential for additional criminal penalties. A term of imprisonment probably is not needed to protect the public from further crimes by Jewell.

**D.       THE NEED TO PROVIDE THE DEFENDANT WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER**

Jewell is highly educated and needs no educational or vocational training. There is no evidence that he needs any medical care or other correctional treatment. A term of imprisonment is not needed to accomplish the goals of § 3553(a)(2)(D).

### CONCLUSION OF THE § 3553(a)(2) FACTORS

In considering all of the factors under § 3553(a)(2), the Court has concluded that the sentence is sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of subsection 3553(a) is a term of imprisonment of 30 months and a fine of $25,000. In this Court's view, that is a severe penalty, but not one that is greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence to criminal conduct.

In reaching the conclusion that the appropriate sentence under § 3553(a) is a term of imprisonment of 30 months and a fine of $25,000, the Court has necessarily determined that a sentence within the guideline range of 41 to 51 months imprisonment would be greater than necessary to comply with the purposes set forth in § 3553(a)(2). A sentence within the guideline

18

range would be between 67% and 88% of the statutory maximum term of imprisonment of five years. The guideline range is largely driven by the calculation of the tax loss, which of course is an important consideration in determining the seriousness of the offense, but an exaggerated emphasis on the amount of the loss could result in a term of imprisonment for a first conviction that is at or near the statutory maximum term of imprisonment. Congress has determined that the maximum term of imprisonment for a conviction under 26 U.S.C. § 7201 is five years regardless of the amount of the loss and regardless of the number of prior convictions. When Congress has determined that the seriousness of the offense is such that the maximum term of imprisonment is five years regardless of the amount of the loss or the number of prior convictions, it seems disproportionate to that congressional determination that a first offense may result in a term of imprisonment of 41-51 months.[5] In considering all of the factors under 18 U.S.C. § 3553(a)(2), the Court has concluded that a sentence sufficient but not greater than necessary to accomplish those goals in this case includes a term of imprisonment that is one-half of the statutory maximum and a fine that is one-fourth of the statutory maximum. In so doing, the Court has left room for more serious punishment to be imposed upon recidivist offenders who have committed a crime similar to that committed by Jewell, who is not a recidivist offender.

---

[5] It is difficult to see how the tax table in U.S.S.G. § 2B4.1 is proportioned to the maximum term of imprisonment of five years provided in § 7201 because the tax table for a level 26 when the tax loss exceeds $80,000,000, which under the sentencing table would result in a range of 63-78 months imprisonment for a person with a criminal history category of I. In other words, the tax table in U.S.S.G. § 2B4.1 can yield a sentence on a first conviction that exceeds the statute maximum for a conviction under 26 U.S.C. § 7201. The tax table would not result in a sentence greater than the statutory maximum for Jewell, but the concern is that offense levels under the tax table are ordered toward a maximum sentence that exceeds the statutory maximum for the offense of conviction and therefore the tables are out of proportion to the applicable statute maximum.

In imposing a term of imprisonment of 30 months, the Court has rejected Jewell's request for a probationary sentence. Jewell argues in part that the investigation and prosecution over the past several years has already imposed substantial punishment upon him. He argues also that if the conviction is upheld he will lose his law license permanently, which he says is additional punishment that should be considered. It is no doubt true that the investigation and prosecution over the past several years have been expensive for Jewell and have involved substantial mental anguish. It is also true that Jewell likely will never practice law again. Nevertheless, the Court rejects those as appropriate considerations in determining the proper sentence under 18 U.S.C. § 3553(a)(2).

Jewell of course exercised his constitutional right to plead not guilty and go to trial on the charges against him, and he prevailed on several counts. Had he prevailed on all counts, no sentencing would be necessary. A defendant who pleads not guilty and puts the government to its proof has done nothing wrong by doing so, even if he is convicted, because our system of justice guarantees to every person who is charged with a crime the right to pursue that course. Although a defendant is entitled to plead not guilty and require the government to prove guilt beyond a reasonable doubt to a jury, that he does so and incurs the attendant expense and anguish is no ground for reducing the extent of his punishment after a determination of guilt. On Jewell's argument, if a defendant were to enter a guilty plea at the inception, the punishment should be greater than if he were to plead not guilty and be convicted at trial, which is not a proposition that the law endorses.

Jewell's argument that he will be punished by losing his law license likewise is misconceived. If that argument were accepted, a lawyer who uses his law license to commit a felony, as Jewell did, would receive less punishment than a citizen who had never been granted that position of trust but who committed the same felony, which is absurd.

20

## VI.

Jewell has objected to the finding in the presentence report that the Mandatory Victims Restitution Act requires that restitution be ordered as a part of the punishment in this case. Jewell argues that restitution is not applicable because the Mandatory Victims Restitution Act does not authorize restitution for convictions of offenses under Title 26. The Mandatory Victims Restitution Act is set out in 18 U.S.C. § 3663A. Subsection 3663A(c)(1) provides that that section applies to all convictions for crimes of violence, offenses against property under Title 18 or § 416(a) of the Controlled Substances Act (21 U.S.C. § 856(a)), or an offense described in § 1365 (relating to tampering with consumer products). Offenses under Title 26 are not listed. Courts have held that restitution may not be ordered for a Title 26 offense except as a condition of probation or supervised release under 18 U.S.C. §§ 3583(d), 3563(b)(2), and 3556. *See, for example, United States v. Nolen*, 523 F.3d 331, 332 (5th Cir. 2008).

The government notes that the Mandatory Victims Restitution Act does apply to offenses against property under Title 18 and argues that because the count of conviction included a charge under aiding and abetting, 18 U.S.C. § 2 on restitution is mandatory. As authority, the government cites *United States v. West Indies Transport, Inc.*, 127 F.3d 299 (3rd Cir. 1997), where the court affirmed an order of restitution under 18 U.S.C. § 3663. There, the defendants were convicted of aiding and abetting violations of the environmental laws in Title 33. The court affirmed on the ground that restitution is authorized for violation of 18 U.S.C. § 2. *Id*. at 315. The government also cites *United States v. Anderson*, 85 F. Supp. 2d 1084 (D. Kan. 1999), where the court held that where the offense of conviction includes a charge of aiding and abetting or where the defendant is

21

convicted of conspiracy, the defendant is subject to a sentence of restitution, citing 18 U.S.C. § 3663(a)(1)(A).  *Id.* at 1101.

The government's argument may work for the offense of conspiracy, which is a separate crime from the predicate conduct and which is punished under Title 18.  *See United States v. Minneman*, 143 F.3d 274, 284 (7th Cir. 1998).  However, 18 U.S.C. § 2 provides that a person who is guilty of aiding and abetting "is punishable as a principal."  A principal convicted of tax evasion in violation of 26 U.S.C. § 7201 would not be subject to the Mandatory Victims Restitution Act, though restitution could be ordered as a condition of probation or supervised release, so the same must be true for a person who aids and abets tax evasion because he is "punishable as a principal." *Cf. United States v. Elias*, 269 F.3d 1003, 1021 (9th Cir. 2001).

In other words, the Mandatory Victims Restitution Act does not apply to Jewell's case even though he was convicted of aiding and abetting under 18 U.S.C. § 2.  Restitution may be ordered as a condition of probation or supervised release, but it is not mandatory.  The Internal Revenue Service has ample capacity to collect taxes due and owing from the taxpayer, who is Carl Evans, not Barry Jewell.  The IRS has entered into a settlement with Evans pursuant to which Evans has or will pay the taxes that should have been paid in 2000.  Consequently, the Court will not impose restitution as a requirement of supervised release.

## VII.

The statute of conviction provides for an award of the costs of prosecution.  26 U.S.C. § 7201.  Such an award is mandatory.  *United States v. Wyman*, 724 F.2d 684, 688 (8th Cir. 1984). The costs recoverable are the same as those recoverable under 28 U.S.C. § 1920.  For the reasons stated on the record, costs are awarded in the amount of $4,202.66.

IT IS SO ORDERED this 14th day of April, 2009.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE